BROWN, Judge.
The appellant, K.E.H., was charged in two delinquency petitions with the capital murder of Loy Harper. One petition charged the appellant with the capital offense of intentional murder during a burglary, see § 13A-5-40(a)(4), Code of Alabama 1975. The other petition charged the appellant with the capital offense of intentional murder during a robbery, see § 13A-5-40(a)(2), Code of Alabama 1975. The state filed a motion to transfer the appellant to the circuit court of Walker County for prosecution as an adult. After a hearing on the matter, the juvenile court granted the state’s motion. The appellant appeals from the order of the Walker County Juvenile Court directing that he be transferred to the circuit court for prosecution as an adult.
The appellant contends that the juvenile court erred in finding that there were “no reasonable grounds to believe [that he] is committable to an institution or agency for the mentally retarded or mentally ill.” (C.R.100.) In support of his assertion, he argues that the overwhelming evidence established that he was committable to an institution for the mentally retarded. We note that the record does not contain a petition for involuntary commitment.
“The transfer of a juvenile to circuit court for • prosecution on a criminal charge is governed by Ala.Code 1975, § 12-15-34. Subsection (c) of that statute provides:
“ When there are grounds to believe that the child is committable to an institution or agency for the mentally retarded or mentally ill, the court shall proceed as provided in Section 12-15-70.’
“Section 12-15-70 provides, in relevant part, that a juvenile court may order a child to be examined by a mental health professional, who will then report the child’s condition to the court. That section further provides that if the report leads the court ‘to believe that a minor or child is mentally ill or mentally retarded, as defined in this chapter, the court shall proceed in the manner set out in Section 12-15-90.’ (Emphasis added.)
“Section 12-15-90 authorizes the involuntary commitment of minors and provides a procedure for that commitment. Section 12 — 15—90(j) provides that a court may order the commitment of a minor to the Department due to his mental retardation if there is substantial evidence 1.) that the child is mentally retarded; 2.) that the child is not of borderline intelligence or mildly retarded; and 3.) that, if the child is allowed to remain in the community, he is likely to cause serious injury to himself or to others or that adequate care, rehabilitation, and ■ training opportunities are available only at one of the Department’s facilities. While certain of the procedures are mandatory, the commitment decision remains in the court’s discretion.”
M.D. v. State, 701 So.2d 58, 59-60 (Ala.Cr.App.1997). (Some emphasis added; some emphasis original.) The term “mentally retarded” is not defined in Chapter 15 of
*471 Title 12, see B.C.B. v. State, 631 So.2d 283, 284 (Ala.Cr.App.1993); however, § 12-15-90(j)(2) provides that for the purpose of determining whether the child is borderline or mildly retarded, the following definition shall apply:
“A borderline retarded person is an individual who is functioning between one and two standard deviations below the mean, and the mildly retarded person is an individual who is functioning between two and three standard deviations below the mean on a standardized intelligence test such as the Stanford Binet scale and on measures of adaptive behavior such as the American Adaptive Behavior scale.”
Pursuant to a court order Dr. John R. Goff, a clinical neuropsychologist, evaluated the appellant, who at the time of the evaluation was 15 years and 9 months old. Dr. Goff conducted his evaluation on September 7, 1996. Dr. Goff prepared a lengthy report of his findings, which was introduced into evidence during the transfer hearing. Dr. Goff evaluated the appellant by means of several different tests, including the third edition of the Wechsler Intelligence Scale for Children (WISC-III). On the WISC-III, the appellant obtained a full scale IQ score of 53, which, Dr. Goffs report states, “falls toward the lower end of the mildly retarded range of psychometric intelligence.” (C.R.133.) Dr. Goff found that the appellant’s “test age” was equivalent to that of a 7 and 1/2-year-old to 8-year-old child.
Dr. Goffs testimony at the transfer hearing was similar to the information presented in his report. Dr. Goff testified that the appellant obtained a full scale IQ score of 53, and that “[tjhat score falls right toward the lower end of the mildly retarded range and actually in a band of error ... between the moderately and mildly retarded range.” (R. 50.) He said that “this is a significant problem for [the appellant] in terms of his cognition, his ability to understand things and his ability to function.” (R. 50.)
When asked whether the appellant’s IQ places him in the moderate range or in the borderline range of mental retardation, Dr. Goff responded:
“It actually places him on the cusp, so to speak, from the standpoint of a statistical diagnostic and statistical manual of the Psychiatric Association, which is what we typically use. There’s a band of borderline range — I shouldn’t use borderline because that’s another concept. But there’s an area there between 50 and 55 where the determination is essentially made by other factors and also by the clinician. We still have some clinical capacity to make a judgment as to mild or moderate.”
(R. 53.) Dr. Goff testified that the diagnosis of mental retardation is not strictly based on IQ score. He clarified, “It’s based on two other factors as well, that is the presence of significant, and what we call, adaptive skill function deficits, which he certainly has and also ... the etiology has to be before the person was 18 years of age and all those criteria are met.” (R. 53-54.)
During Dr. Goffs testimony, the following occurred:
[Dr. Goff]: ... Now, to a certain extent determining whether or not he’s mild or moderately retarded, although from my standpoint it’s an academic issue, we would determine that primarily based on the degree of the deficits he demonstrates in terms of social skills, academic skills, his ability to access community resources and a number of other areas, all — in most of which he shows substantial deficits in those areas.
“Q [Defense counsel]: Now, are you familiar with the statutory definition of moderately retarded?
“A: Yes, I am.
“Q: And would you explain that to the court?
“A: Well, it’s my understanding in Alabama and the statute is primarily related to commitment to a mental *472 health or mental retardation facility that mild mental retardation is defined as functioning two to three standard deviations below the mean with this particular test, at least the theoretical standard deviation is 15, the mean is 100. So with an IQ of 53 he’d be classified according to the State Legislature, I guess, as moderately retarded.
“Q: And that would be grounds to believe he is committable to a mental retardation institution?
“A: He is committable, yes, according to that criteria.”
(R. 54-55.) (Emphasis added.) Dr. Goff reiterated on cross-examination and on redirect examination that, based on his evaluation, the appellant was committable to the State Department of Mental Health and Mental Retardation. (R. 67-69.)
Dr. Kathleen Ann Ronan, a clinical psychologist and certified forensic examiner employed by the Taylor-Hardin Secure Medical Facility, evaluated the appellant pursuant to a court order. Her primary purpose in evaluating the appellant was to assess his competence to stand trial and his mental state at the time of the offense. She conducted her evaluation at the Taylor-Hardin facility on January 6, 1997. She concluded, in relevant part, that the appellant suffered from mild mental retardation. Her report was admitted into evidence.
Dr. Ronan testified at the transfer hearing that although she conducted an intellectual screening of the appellant, she did not give an entire intelligence test. She explained that because Dr. Goff had previously done an intellectual screening on the appellant, she feared artificially elevated scores due to a “practice effect” if she were to administer another intelligence screening. (R. 73.) She testified, however, that she had no reason to dispute Dr.-Goffs findings regarding the appellant’s intelligence, because the scores were consistent with the results of the appellant’s prior intellectual testing.
When defense counsel asked Dr. Ronan whether she believed the appellant was moderately retarded, the following transpired:
“A: He falls on the cusp between mild and moderate. The actual score that he achieved on that particular administration falls in the cusp range which is 50 to 55, according to our — the DSM-4, which is—
“Q: And besides just the score range his social factors go into that?
“A: Yes, sir.
“Q: And what is the result of — What social factors did you analyze as to him?
“A: He had been given an adaptive behavior measurement in the past. Also in speaking with him in terms of his decision making, what — my findings were very much in keeping with what had been found in the past and that he did have deficits in his adaptive capacity, his ability to manipulate himself in life and the skills to really participate in life making decisions, that type of thing. They fell in keeping with other individuals who would be in the mild to moderate range of retardation.
“Q: Do you think he has reckoning skills to function in an adult society?
“A: He does not function normally, he has impairments, sir.
“Q: And what is that impairment, besides his mental retardation?
“A: Well, his impairments would be in judging for himself, making decisions. He is impaired with respect to that due to his intellectual deficits. He cannot read social cues. He acts inappropriately in social situations. He is not able to cope well. In other words, the intellectual deficits prohibit him from being able to behave in a normal manner.
[[Image here]]
“Q: Are there grounds to believe that he is committable to a mental retardation facility ?
*473 “A: To the Division of Mental Retardation within the Department, yes sir.
“THE COURT: Have you ever seen one with his IQ that’s been accepted in recent years?
“A: Yes, sir.”
(R. 74-76.) (Emphasis added.)
She testified that in her opinion the appellant operated on the mental and emotional equivalent of an 8- or 9-year-old child. On redirect and recross-examination, Dr. Ronan again testified that the appellant met the criteria for commitment to the State Department of Mental Health and Mental Retardation. (R. 88-89.)
Dr. Goff and Dr. Ronan were recalled several times to clarify various portions of their testimony; however, their conclusion that the appellant was committable to the State Department of Mental Health and Mental Retardation based on his level of mental retardation did not change.
On October 16, 1996, Steve Hulsey, a juvenile probation officer, prepared a certification report that was admitted into evidence at the transfer hearing. In his report, Hulsey found, in relevant part: “[K.E.H.] is a mentally retarded youth who has a performance IQ of 59, verbal IQ of 63 and full scale IQ of 57. This places him in the mild retardation range of mental functioning.” (C.R.126.) The basis for Hulsey’s conclusions regarding the appellant’s intelligence level are not contained in the report. Hulsey recommended that the appellant “be removed from the community and placed with the State of Alabama Department of Youth Services until he is twenty-one years of age.” (C.R.126.)
On May 1, 1997, approximately a month after the transfer hearing, Randi Coleman, a psychologist who is apparently employed with Region II Community Services-West, conducted an evaluation of the appellant. Coleman prepared a report entitled, “Region II Community Services-West: Screening Evaluation Report.” (C.R.95.) This report is contained in the record on appeal. Coleman indicated that the purpose of the evaluation was to determine the appellant’s eligibility for mental retardation services and to provide recommendations to the Court. Because the appellant was 16 years old at the time of Coleman’s evaluation, Coleman administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R) to the appellant. Coleman’s results, in relevant part, are as follows:
“While the test is structured in a manner similar to the WISC-R and WISC-III, the questions and tasks are different. Therefore, practice effects should not be an issue. On this administration of the WAIS-R, [the appellant] obtained a Verbal I.Q. score of 76, a Performance I.Q. score of 70 and a Full Scale I.Q. score of 72. His scaled scores on individual subtests were relatively consistent, ranging from 3 — 7, with most of the scores being 4, 5 and 6. These test results indicated that [the appellant] currently functions intellectually within the range of Borderline Intelligence rather than Mild Mental Retardation. The AAMD Adaptive Behavior Scale was also administered by the examiner based on interviews with staff at the Coosa Valley Center and [the appellant]. While he does have some specific deficits, [the appellant] does not exhibit a significant overall deficit in adaptive functioning as compared to person with mental retardation.”
(C.R.97.) Coleman further reported:
“[The appellant] currently exhibits intellectual functioning within the range of Borderline Intelligence and does not have a significant overall deficit in adaptive functioning. Therefore, he does not meet the criteria for a diagnosis of mental retardation as outlined in Classification in Mental Retardation, 1983. There was no evidence of psychotic symptoms at the time of this evaluation.”
(C.R.97.) Coleman concluded that the appellant was “not eligible for services *474 through the Mental Retardation Division of the Alabama Department of Mental Health and Mental Retardation.” (C.R.98.)
On May 22, 1997, the juvenile court entered a written order granting the state’s motion to transfer the appellant to the circuit court for prosecution as an adult. The juvenile court found, in relevant part, that “there are no reasonable grounds to believe that the said child is committable to an institution or agency for the mentally retarded or the mentally ill....” (C.R. 100.) The trial court did not expound on this conclusion.
Although a juvenile court is not required to set forth specific findings to support its determination that there are no reasonable grounds to believe the child is committable to an institution for the mentally retarded, under the unique circumstances of this case, we cannot properly evaluate the juvenile court’s conclusion that the appellant was not committable without an understanding of the juvenile court’s rationale in reaching this conclusion. There was “substantial evidence” presented that the appellant was mentally retarded, and that he was not merely borderline or mildly retarded, as those terms are defined in § 12 — 15—90(j)(2), Code of Alabama 1975. The appellant had an extensive history of mental retardation. Furthermore, both Dr. Goff and Dr. Ronan testified that the appellant was committa-ble to the State Department of Mental Heath and Mental Retardation. During the transfer hearing, the juvenile court even appeared to take judicial notice that the appellant’s retardation level rendered him eligible for commitment to the State Department of Mental Health and Mental Retardation. (R. 116.) Although the conclusion reached by psychologist Randi Coleman regarding the appellant’s intelligence level appears to conflict with the conclusions reached by Dr. Goff and Dr. Ronan, we do not know what weight, if any, the juvenile court gave Coleman’s report. We also note that the juvenile court found probable cause to believe that the appellant committed the offense charged in the petition; thus, it would appear that the third criterion of § 12 — 15—90(j)—that the appellant, “if allowed to remain in the community, is likely to cause serious injury to himself or others” — was satisfied.
In conclusion, there was “substantial evidence,” although not uncontradict-ed, that the appellant was committable to the State Department of Mental Health and Mental Retardation, yet the trial court, without explanation, concluded that there were no reasonable grounds to believe that the appellant was committable. The decision to commit or not to commit an individual is within the trial court’s discretion. M.D. v. State, 701 So.2d 58. In this case, without an explanation for the trial court’s decision, we are unable to adequately evaluate the trial court’s conclusion to determine if it constitutes an abuse of discretion. We do not foreclose the possibility that the trial court has a valid explanation for reaching the conclusion that it did. Because the appellant is facing the most serious of charges, we believe the most prudent course of action is to remand this cause to the juvenile court with instructions that the juvenile court enter a new written transfer order. In its new order, the juvenile court should explain why it determined that there were no reasonable grounds to believe that the appellant was committable to the State Department of Mental Health or Mental Retardation.
In addition, the juvenile court should ensure that the new order reflects that it considered all of the six factors set forth in § 12 — 15—34(d), Code of Alabama 1975. See Ex parte S.B, 650 So.2d 953, 955-56 (Ala.1994). The present order does not reflect that the trial court considered § 12-15-34(d)(2) or (4). We pretermit discussion of the remaining issues pending the return to remand.
The juvenile court shall take all necessary action to see that the clerk makes due *475 return to this Court at the earliest possible time and within 42 days of the release of this opinion.
REMANDED WITH INSTRUCTIONS. 
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.